**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| BENOIT BALDWIN,<br><br>Plaintiff,<br><br>v.<br><br>CHARLES DUQUETTE and<br>TOWN OF TISBURY,<br><br>Defendants. | ) | No. 1:24-cv-13183-JEK |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS**

**KOBICK, J.**

Plaintiff Benoit Baldwin, proceeding *pro se*, asserts that the defendants—Charles Duquette, a Detective with the Tisbury Police Department, and the Town of Tisbury—violated his Fourth Amendment right against malicious prosecution and his constitutional rights to privacy and intimate association. Pending before the Court is the defendants' motion to dismiss those claims. For the reasons that follow, that motion will be granted in part and denied in part. Both claims against the Town of Tisbury will be dismissed because Baldwin fails to plausibly allege that the Town deliberately caused his injuries through a municipal policy or custom or through its failure to train law enforcement officers. The privacy and intimate association claims against Duquette will likewise be dismissed because he is entitled to qualified immunity on those claims. But because Baldwin plausibly alleges that Duquette caused him to be subjected to detention and criminal proceedings without probable cause, the malicious prosecution claim against Duquette will proceed to discovery.

## BACKGROUND

The following facts, which are assumed true on a motion to dismiss, are drawn from the second amended complaint, documents fairly incorporated by reference in that pleading, and documents subject to judicial notice.

In June 2021, Baldwin met a girl, referred to here as "W.," online and began messaging her. ECF 37, ¶¶ 9-10. Shortly after, Baldwin proposed marriage and W. accepted. *Id.* ¶ 11. Baldwin and W. planned for W. to live with Baldwin in Massachusetts on Martha's Vineyard after her eighteenth birthday. *Id.* ¶ 12. When W. turned eighteen, she notified her parents that she would be moving to Martha's Vineyard. *Id.* ¶ 13. W.'s father discovered Baldwin's identity and called the Tisbury Police Department. *Id.* ¶ 14.

On October 25, 2021, Detective Duquette called W.'s father and told him that Baldwin had a 2018 conviction for knowingly purchasing or possessing visual material of a child depicted in sexual conduct, in violation of M.G.L. c. 272, § 29C, and was currently serving probation for that offense. *Id.* ¶ 15. The information conveyed about Baldwin's probation status was wrong, as Baldwin was not on probation at the time. *Id.* ¶¶ 16-17. Duquette allegedly stated on that call that Baldwin had not committed any crime arising out of his relationship with W. *Id.* ¶ 18. The next day, Duquette called W.'s mother to inform her that Baldwin was unemployed and living with his mother, and that if W. moved to live with Baldwin, "all eyes" would be on them. *Id.* ¶¶ 19-20. The same day, Duquette called W. and shared Baldwin's criminal record, employment status, and residential status, and discouraged her from moving to the island. *Id.* ¶ 21. Three days later, W. moved to Martha's Vineyard to live with Baldwin. *Id.* ¶ 23. At the time, Baldwin was working as a delivery driver for FedEx and had secured a lease for a winter rental apartment. *Id.* ¶¶ 24, 26.

On December 17, 2021, Duquette filed a criminal complaint against Baldwin for one count of failure to register as a sex offender, in violation of M.G.L. c. 6, § 178H(a), and a warrant was issued for Baldwin's arrest. *Id.* ¶¶ 28-29. In support of the criminal complaint, Duquette stated that he had been investigating whether Baldwin's visit with W. in Lexington, Kentucky during the summer of 2021, when she was still seventeen, violated the Massachusetts Sex Offender Registry law, M.G.L. c. 6, §§ 178C-178Q. *Id.* ¶ 30. Duquette accused Baldwin of failing to register a secondary address—that is, a non-primary address at which Baldwin resided for four or more consecutive or non-consecutive days in a month, or fourteen or more days in a year—as required under M.G.L. c. 6, §§ 178C and 178H(a). *Id.*[1] By tracing Baldwin's bank transactions, Duquette had concluded that Baldwin had traveled to Kentucky from June 28 to July 12, 2021, and had failed to report any out-of-state secondary addresses. *Id.* Baldwin alleges that Duquette had reason and evidence to know, based on the same bank transactions, that he had not violated the secondary address registration requirement. *Id.* ¶¶ 31-36. Baldwin maintains that Duquette lied in his report in order to pursue the criminal charge against him. *Id.* ¶¶ 36-37.

Police officers executed the arrest warrant in the early morning hours of December 20, 2021 and booked Baldwin into the Dukes County Jail. *Id.* ¶¶ 41-46. At his arraignment later that day, Baldwin had his bail revoked on an open case from 2020 for one count of failure to register as a sex offender, and he was detained in that jail. *Id.* ¶¶ 47-48, 64.[2] While Baldwin was in custody,

[1] In full, under the Massachusetts Sex Offender Registry law, "secondary addresses" include "addresses of all places where a sex offender lives, abides, lodges, or resides for a period of 14 or more days in the aggregate during any calendar year and which is not a sex offender's primary address; or a place where a sex offender routinely lives, abides, lodges, or resides for a period of 4 or more consecutive or nonconsecutive days in any month and which is not a sex offender's permanent address, including any out-of-state address." M.G.L. c. 6, § 178C.

[2] The Edgartown District Court has since dismissed the 2020 case against Baldwin without prejudice due to lack of prosecution. *Commonwealth v. Baldwin*, No. 2035CR000331 (Mass. Dist. Ct. June 17, 2022); ECF 37, ¶ 73.

Duquette approached W. in an attempt to convince her to leave Baldwin by, among other things, suggesting that he was involved in identity theft and sharing the details of his 2018 conviction. *Id.* ¶¶ 50-52, 54. W. stated that she would reevaluate her relationship with Baldwin but declined Duquette's offer to take her off the island. *Id.* ¶¶ 55-57. Duquette responded that he did not "want to perpetuate a relationship between a 46-year-old man and an 18-year-old girl." *Id.* ¶ 59.

On December 30, 2021, the Edgartown District Court granted Baldwin's motion to dismiss the December 17, 2021 criminal complaint. *Id.* ¶¶ 60-61; *Commonwealth v. Baldwin*, No. 2135CR000504 (Mass. Dist. Ct. Dec. 30, 2021). Baldwin was then released from custody on the condition that he notify the Court of off-island travel. ECF 37, ¶ 63. Baldwin asserts that his ten-day detention resulted in the termination of his employment, the closure of his personal and joint accounts at Santander Bank, and his inability to make a car payment. *Id.* ¶¶ 64-66.[3] Baldwin was forced to take a job as a dishwasher and line cook, and Baldwin and W. chose to leave Martha's Vineyard after failing to secure housing. *Id.* ¶¶ 68, 70, 72. In the winter of 2022-2023, over a year after Baldwin's detention, W. separated from Baldwin and broke off their engagement. *Id.* ¶ 75.

On December 26, 2024, Baldwin filed his original complaint in this action. ECF 1. He thereafter amended his complaint twice. ECF 28, 37. The second amended complaint claims, pursuant to 42 U.S.C. § 1983, that Duquette and the Town of Tisbury violated Baldwin's Fourth Amendment right against malicious prosecution (Count I) and his rights to privacy and intimate association guaranteed by the First, Ninth, and Fourteenth Amendments (Count II). ECF 37, ¶¶ 89-111. As relief, Baldwin seeks compensatory and punitive damages. *Id.* at 16. Duquette and the

[3] The docket for the case associated with the December 17, 2021 criminal complaint indicates that Baldwin was released on personal recognizance on December 20, 2021, the same day he was arrested. *Commonwealth v. Baldwin*, No. 2135CR000504 (Mass. Dist. Ct. Dec. 20, 2021). But the defendants do not dispute that Baldwin was detained for ten days, and, in any event, the Court must accept that allegation as true at this stage in the proceedings.

Town of Tisbury filed a motion to dismiss. ECF 41. After receiving Baldwin's opposition brief, the Court held a hearing and took the motion under advisement. ECF 46, 51.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. The Court may consider "'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (quotation marks omitted). Where, as here, the plaintiff is proceeding *pro se*, the Court construes the complaint liberally. *See Vieira v. De Souza*, 22 F.4th 304, 311 (1st Cir. 2022).

## DISCUSSION

### I. Claims Against Duquette.

Baldwin asserts claims under 42 U.S.C. § 1983 against Duquette, in his individual and official capacities, for malicious prosecution and for violating Baldwin's rights of privacy and intimate association. A suit against a public servant in his official capacity "is, in reality, a suit against the governmental entity, not against the governmental actor." *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 705 (1st Cir. 1993). Because Baldwin has asserted the same two claims

against the Town of Tisbury, and his official-capacity claims against Duquette are indistinguishable from his claims against the Town, which are addressed later in this opinion, the Court will dismiss his official-capacity claims against Duquette as duplicative of his claims against the Town. *See Traudt v. Lebanon Police Dept.*, 749 F. Supp. 3d 251, 258 (D.N.H. 2024). In this section, the Court will address Baldwin's individual-capacity claims against Duquette.

A. Malicious Prosecution Claim.

Baldwin first asserts that Duquette initiated criminal proceedings against him and caused him to be detained without probable cause, in violation of his rights under the Fourth Amendment. A claim for malicious prosecution affords a remedy to individuals "targeted for unreasonable, baseless prosecutions, and who, as a result, are detained without probable cause during the pretrial period." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 98 (1st Cir. 2013). To state a malicious prosecution claim, Baldwin must plausibly allege that Duquette "(1) caused (2) a seizure of [him] pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in [his] favor." *Id.* at 101. Duquette does not dispute that Baldwin adequately alleges that Duquette caused the criminal complaint to be instituted against him and that he was subjected to arrest and pretrial detention for ten days as a result. *See id.* at 100; ECF 37, ¶¶ 28, 90; *supra* note 3. Nor does he dispute that criminal proceedings terminated in Baldwin's favor when, on December 30, 2021, the charge of failing to register as a sex offender in violation of M.G.L. c. 6, § 178H(a) was dismissed without prejudice. *See* ECF 37, ¶¶ 60-62; *Thompson v. Clark*, 596 U.S. 36, 48 (2022) (a plaintiff pressing a malicious prosecution claim need not show that "his prosecution ended with an affirmative indication of innocence"). Rather, Duquette argues that Baldwin fails to plausibly allege that he was seized without probable cause. As Duquette sees it, Baldwin makes only conclusory allegations that Duquette used false information to obtain a warrant for his arrest and

initiate criminal proceedings against him. Baldwin disputes that the arrest warrant was supported by probable cause, contending that it was based on Duquette's false statements and misleading omissions.

To overcome the presumption that his arrest warrant, issued by a neutral magistrate, was supported by probable cause, Baldwin must plausibly allege "that—despite the magistrate's determination that the evidence presented was, on its face, sufficient to establish probable cause—that evidence was, in fact, constitutionally unacceptable because [Duquette] formulated evidence essential to the probable cause determination with a mental state similar to common law malice." *Hernandez-Cuevas*, 723 F.3d at 100-01. Such a showing may be based on allegations that Duquette "acted in reckless disregard, with a 'high degree of awareness of [the] probable falsity' of statements made in support of [the] arrest warrant," or intentionally or recklessly omitted material exculpatory facts from the information presented to the magistrate. *Burke v. Town of Walpole*, 405 F.3d 66, 81 (1st Cir. 2005) (quoting *Forest v. Pawtucket Police Dep't*, 377 F.3d 52, 58 (1st Cir. 2004)).

The second amended complaint contains specific factual allegations that, at this early stage in the case, meet this standard. To prove that Baldwin failed to notify the Tisbury Police Department of a secondary address in Kentucky in violation of M.G.L. c. 6, §§ 178C and 178H(a), the Commonwealth would have had to establish that Baldwin, as a sex offender with registration obligations, "'stayed at an address other than [his home address] for either fourteen days in a calendar year or for four or more days in a month.'" *Commonwealth v. Arce*, 467 Mass. 329, 333 (2014) (quoting *Commonwealth v. Kateley*, 461 Mass. 575, 581 (2012)). Baldwin alleges that Duquette knew he did not violate the statute because lodging payments on his bank statements showed that he did not stay for four or more nights at one motel address in Kentucky. ECF 37,

¶ 32. He also claims that Duquette deliberately omitted transactions "indicating travel back to Massachusetts in under 14 days." *Id.* ¶ 33. Duquette's statement in support of the criminal complaint reported that Baldwin made a "month long travel reservation," based on his departure from Martha's Vineyard on a June 27, 2021 ferry and return to the island on a July 26, 2021 ferry. *Id.* ¶ 30. But, Baldwin alleges, records showed that he made several trips to and from Martha's Vineyard within that thirty-day window, since "[s]everal [ferry service] fees were on [his] Steamship Authority record." *Id.* ¶¶ 33-35. In Baldwin's view, Duquette "had reason and evidence to know," based on the records discussed in Duquette's statement, that he "had not made a 'month long travel reservation.'" *Id.* ¶ 36. Baldwin further faults Duquette for stating that "Baldwin was out of state" from June 28 until July 12, 2021—that is, for fourteen days—without identifying any out-of-state bank transactions between July 9 and July 12, 2021. *Id.* ¶¶ 28, 30.

Viewed together, these allegations could give rise to the plausible inference that Duquette acted with a high degree of awareness of the probable falsity of his allegations against Baldwin, or recklessly omitted material information from the summary of the bank records presented to the magistrate, in averring that Baldwin failed to register a secondary address at which he resided for four or more days in a month or fourteen or more days in a year. Baldwin has, accordingly, stated a plausible claim that he was detained without probable cause in violation of the Fourth Amendment's prohibition against unreasonable seizures. Duquette's motion to dismiss Count I will be denied.

B. Right to Privacy and Intimate Association Claim.

Baldwin asserts in Count II that, in violation of his rights to intimate association and privacy, Duquette substantially interfered with Baldwin's relationship with W., with the aim of terminating their engagement. Duquette argues that he is entitled to qualified immunity for these

alleged constitutional violations because there was not, in 2021, a clearly established right to privacy and intimate association between two adults who are engaged but are not yet married.

Qualified immunity shields government officials performing discretionary functions from civil damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The qualified immunity inquiry proceeds with a now-familiar two-part test: (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation." *Penate v. Hanchett*, 944 F.3d 358, 366 (1st Cir. 2019) (quotation marks omitted). A court "need not engage in the first inquiry and may choose . . . to go directly" to the "clearly established" prong, which itself involves two sub-inquiries. *Id.* The first "'focuses on the clarity of the law at the time of the violation.'" *Id.* (quoting *Drumgold v. Callahan*, 707 F.3d 28, 42 (1st Cir. 2013)). The second "'focuses more concretely on the facts of the particular case and whether a reasonable defendant would have known that his conduct violated the plaintiff's constitutional rights.'" *Id.* (quoting *Drumgold*, 707 F.3d at 42). "[T]he salient question is whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009).

The constitutional right of intimate association, rooted in the personal liberty protections of the Fourteenth Amendment, preserves "certain kinds of highly personal relationships . . . from unjustified interference by the State." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *see Poirier v. Mass. Dep't of Corr.*, 558 F.3d 92, 95 (1st Cir. 2009). The intimate relationships, affiliations, and activities that may be "entitled to this sort of constitutional protection"—including marriages, childbirth, the raising and education of children, and cohabitation with relatives—by

their nature "involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Roberts*, 468 U.S. at 619-20. Baldwin acknowledges that his relationship with W. fell into none of the intimate relationships previously recognized by the Supreme Court as meriting constitutional protection. And he further states that no Supreme Court or First Circuit authority exists for enlarging the scope of constitutionally protected intimate relationships to individuals who are engaged but not yet married or joined in a civil union. ECF 46, at 4. That admission dooms his intimate association claim, because Baldwin has failed to demonstrate that the "contours of the right" were "sufficiently clear that a reasonable official" in Duquette's position would understand that his alleged interference with Baldwin and W.'s relationship "violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Indeed, the First Circuit has observed that the "unmarried cohabitation of adults does not fall under any of the Supreme Court's bright-line categories for fundamental rights in this area" and has "decline[d] to expand upon" the Supreme Court's list. *Poirier*, 558 F.3d at 96 (citing *Roberts*, 468 U.S. at 619). Duquette is, accordingly, entitled to qualified immunity because any right of intimate association as between an engaged and cohabitating couple was not clearly established in 2021.

With respect to Baldwin's claimed violation of a right of privacy, the Supreme Court has recognized "two clusters of personal privacy rights" entitled to protection under the Due Process Clause of the Fourteenth Amendment: an individual's "autonomy in making certain kinds of significant personal decisions" and "confidentiality of personal matters." *Vega-Rodriguez v. Puerto Rico Tel. Co.*, 110 F.3d 174, 182-83 (1st Cir. 1997); *see Whalen v. Roe*, 429 U.S. 589, 598-600 (1977). Baldwin's claim appeals to the latter version of the right. He alleges that Duquette impinged upon his right to confidentiality by revealing his criminal record, probation status, living

situation, and employment status to W. and her parents. ECF 37, ¶¶ 15, 19-21. But he cites no case law clearly establishing that such topics are the types of personal matters encompassed by the Fourteenth Amendment's privacy protections.

Indeed, relevant precedent is to the contrary. The First Circuit has cautioned that the right to confidentiality in personal matters "does not 'exten[d] beyond prohibiting profligate disclosure of medical, financial, and other intimately personal data.'" *Harper v. Werfel*, 118 F.4th 100, 113 (1st Cir. 2024) (quoting *Vega-Rodriguez*, 110 F.3d at 183). Other Courts of Appeals have concluded that the disclosure of a person's criminal record, residential status, and employment status does not transgress the limited liberty interest in the confidentiality of personal information. *See, e.g.*, *Doe v. Garland*, 17 F.4th 941, 944, 946-47 (9th Cir. 2021) (disclosure of a plaintiff's name, age, employment history, and pending criminal charges does not implicate the constitutional right to informational privacy); *Bailey v. City of Port Huron*, 507 F.3d 364, 365 (6th Cir. 2007) (no "constitutional privacy right" to nondisclosure of an arrestee's "name, hometown, photograph, phone number and [spouse's] occupation"); *Eagle v. Morgan*, 88 F.3d 620, 625 (8th Cir. 1996) (no privacy interest in an individual's prior conviction by guilty plea). And the Supreme Court has rejected the argument that the right of informational privacy is implicated by the disclosure of an individual's name, photograph, and alleged participation in criminal conduct, or an "official act such as an arrest." *Paul v. Davis*, 424 U.S. 693, 712-13 (1976). Since relevant precedent in 2021 did not clearly establish that Baldwin had a right to privacy in the substance of the information Duquette allegedly disclosed to W. and her parents, Duquette is entitled to qualified immunity on Baldwin's privacy claim as well. Accordingly, Count II of the second amended complaint will be dismissed as to Duquette.

## II. <u>Claims Against the Town of Tisbury.</u>

Baldwin asserts the same constitutional claims against the Town of Tisbury under 42 U.S.C. § 1983. His claims against the Town are premised on two distinct theories: (1) the Town had a policy or custom that allowed Tisbury police officers to routinely charge people with crimes they did not commit and violate their rights of privacy and intimate association, and (2) the Town failed to properly train police officers on the gathering of evidence and application of criminal laws. ECF 37, ¶¶ 92, 94, 105-07, 110. These theories "each deman[d] a different kind of proof." *Haley v. City of Boston*, 657 F.3d 39, 51 (1st Cir. 2011).

With respect to Baldwin's first theory, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue," because "*[r]espondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694-95 (1978)). A plaintiff must allege that the municipality, "through its *deliberate* conduct, . . . was the 'moving force' behind the injury alleged," *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997), and that the illegal action was taken "pursuant to official municipal policy" or custom "of some nature," *Monell*, 436 U.S. at 691. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

The second amended complaint fails to plausibly allege that the Town had a policy or custom of deliberately charging individuals with crimes they did not commit or transgressing constitutional privacy and intimate association rights. Baldwin does not identify any official policy or custom that allegedly caused law enforcement officers to violate the rights at issue in this case. *See Cosenza v. City of Worcester, MA*, 120 F.4th 30, 41 (1st Cir. 2024). And while a municipal

policy may give rise to liability when a plaintiff alleges persistent and widespread practices that, in effect, have the force of law, Baldwin makes no such allegations here. *Connick*, 563 U.S. at 61. He identifies one other individual whose criminal charges, brought by Duquette through criminal complaint, were dismissed. ECF 37, ¶¶ 85-86. That is not sufficient to plausibly allege a municipal policy, custom, or practice that was the moving force behind Baldwin's alleged detention without probable cause or the alleged violation of any privacy or intimate association rights. *See Mahan v. Plymouth Cnty. House of Corrs.*, 64 F.3d 14, 16-17 (1st Cir. 1995) ("[E]vidence of a single incident is insufficient, *in and of itself*, to establish a municipal 'custom or usage' within the meaning of *Monell*."); *Lavigne v. Great Salt Bay Cmty. Sch. Bd.*, 146 F.4th 115, 127 n.6 (1st Cir. 2025) ("isolated actions of one employee . . . do not allege a 'well settled and widespread' practice").

Turning to Baldwin's second theory, "'[t]riggering municipal liability on a claim of failure to train requires a showing that municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies.'" *Wadsworth v. Nguyen*, 129 F.4th 38, 68 (1st Cir. 2025) (quoting *Cosenza*, 120 F.4th at 38). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. "Typically, '[a] pattern of similar constitutional violations by untrained employees' is necessary to demonstrate deliberate indifference." *Cosenza*, 120 F.4th at 38 (quoting *Connick*, 563 U.S. at 62).

The second amended complaint likewise fails to allege a pattern of constitutional violations that would have plausibly put the Town on notice of inadequacies in its training of police officers. Baldwin identifies a former Tisbury police officer, Sergeant Jeffrey Day, who allegedly subjected a man to false arrest in May 2021. ECF 37, ¶¶ 80, 83. But this incident is not similar

enough to the alleged malicious prosecution at issue here to put the Town on notice that specific training was necessary to avoid the constitutional violation. *See Connick*, 563 U.S. at 62-63 (four prior *Brady* violations were not enough to show a pattern because those incidents were not similar to the *Brady* violation at issue); *Bannon v. Godin*, 99 F.4th 63, 89 (1st Cir. 2024) (to show a pattern, prior excessive force complaints must involve similar violations). Nor does the prior case involving Duquette establish a pattern of comparable violations so widespread as to suggest that the Town was deliberately indifferent in its training of police officers. *See* ECF 37, ¶¶ 85-86. Baldwin's allegations are far too thin to plausibly give rise to municipal liability on a failure-to-train theory. *See Geigel v. Boston Police Dep't*, No. 22-cv-11437-DJC, 2024 WL 68387, at *2-3 (D. Mass. Jan. 5, 2024) (dismissing a failure-to-train claim because the complaint neither identified a deficiency in the police training program at issue, nor a pattern of constitutional violations from which to plausibly infer deliberate indifference). Accordingly, both of Baldwin's claims against the Town will be dismissed.

**CONCLUSIONS AND ORDERS**

For the foregoing reasons, the defendants' motion to dismiss, ECF 41, is GRANTED in part and DENIED in part. All claims against the Town of Tisbury are DISMISSED. As against Duquette, Count II is DISMISSED and Count I remains.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 15, 2026